UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MOHAMED ABO ALI,

                    Plaintiff,

           – *against* –

AMERICAN UNIVERSITY OF
ANTIGUA, INC. *and* MANIPAL
EDUCATION AMERICAS, LLC,

                   Defendants.

**OPINION & ORDER**

25-cv-2065 (ER)

R<small>AMOS</small>, D.J.:

      Mohamed Abo Ali, who is proceeding *pro se*, brings suit against his former medical school, American University of Antigua, Inc. ("AUA"), and the entity that oversees its operations, Manipal Education Americas, LLC ("MEA").  He alleges that the defendants deliberately failed to process his federal student loans to avoid regulatory scrutiny, falsely claimed that the government cancelled the loans to conceal their conduct, and then wrongfully withheld his diploma and transcript until he obtained a substitute loan from a private lender.  He alleges that scores of other students have been subjected to the same course of conduct.  Ali asserts that these actions violated his rights under the Due Process Clause of the United States Constitution, as well as New York law.  Before the Court is the defendants' joint motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

## I.    FACTUAL BACKGROUND[1]

MEA owns and operates AUA, which runs a for-profit medical school on the Caribbean island of Antigua.[2]  Doc. 25 ¶ 17.  MEA oversees AUA's financial, administrative, and operational functions from its principal place of business in New York City.  *Id.*  From the perspective of students, the two entities are "functionally indistinguishable."  *Id.* ¶ 18.  That is because, when communicating with students, they do not distinguish themselves from each other.  *Id.* ¶ 18.  For example, the defendants send emails from shared email addresses and sign these emails with generic titles such as "Loan Officer" or "Financial Aid Department," without stating whether the sender represents AUA or MEA.  *Id.*

In September 2023, the United States Department of Education ("DOE") placed AUA on a "heightened cash monitoring 2" ("HCM2") payment method.  *Id.* ¶ 4; *see also* Federal Student Aid, *Heightened Cash Monitoring*, https://studentaid.gov/data-center/school/hcm.[3]  "This meant the school could no longer receive the usual upfront disbursement for its students' Title IV aid, and would instead have to make funding disbursements to students from its own cash, and then submit a reimbursement request."  *International Junior College of Business & Technology, Inc. v. Duncan*, 802 F.3d 99, 104 (1st Cir. 2015); *see also* 34 C.F.R. § 688.162(d)(2).  Upon receipt of the reimbursement request, the DOE would then "review the disbursements and the school's documentation for errors from [a] sample of students and parents."  4 Federal Student Aid, *2024-2025 Federal Student Aid Handbook* 11–12 (2024).  The DOE could choose to "approve all,

---

[1] The background is drawn from the well-pleaded factual allegations in the second amended complaint, Doc. 25, which, for the purposes of this motion, the Court accepts as true.  *Donoghue v. Bulldog Investors General Partnership*, 696 F.3d 170, 173 (2d Cir. 2012).

[2] AUA is incorporated Florida and headquartered in Antigua and Barbuda.  Doc. 25 ¶ 10.  MEA's sole member is private limited company incorporated in Mauritius.  *Id.* ¶ 7.

[3] The Court may take judicial notice of this information, which was included on the official website of the Department of Education's office of Federal Student Aid.  *Ortiz v. Orange County*, No. 23 Civ. 2802 (VB), 2024 WL 113705, at *2 n.4 (S.D.N.Y. Jan. 10, 2024).

some, or none of the student disbursements in the request" "[d]epending on the school's error rate." *Id.* at 12.

Ali is a former medical student at AUA. *Id.* ¶ 19. He completed the graduation requirements for a Doctor of Medicine on September 13, 2024, and, on October 29, 2024, Ali received an email from Assistant Registrar Mariela Capellan with FedEx tracking information for his diploma and official transcript. *Id.* ¶¶ 19–20. One week later, when Ali had still not yet received his diploma or transcript, he received another email from Capellan stating that there was a "Bursar hold" on his account that was preventing his diploma and transcript from being mailed to him. *Id.* ¶ 20. Prior to this email, there was no indication on Ali's account of any hold. *Id.*

Approximately two weeks later, on November 18, 2024, Ali received another email from the defendants. *Id.* ¶ 21. The email, which was signed by an unidentified "Loan Officer,"[4] stated that the DOE had "required" the retroactive cancellation of his federal loans for the Fall 2023 semester.[5] The same day, the defendants sent Ali a tuition bill that reflected a previous balance of $54,868. *Id.* ¶ 21. This balance contradicted all of Ali's previous tuition statements. *Id.* Indeed, records from AUA's billing portal from October 2023 through November 2024 consistently indicated that AUA had received $9,290 in federal unsubsidized loans and $44,258 in federal Grad PLUS loans for the payment of Ali's Fall 2023 semester. *Id.* ¶ 24.

In an attempt to clarify the situation, Ali reached out to his MEA financial aid advisor, Johanna Gomez, but Gomez refused to return his calls or speak to him. *Id.* ¶ 23. Ali eventually contacted another financial aid advisor, Sharon Lu, who was also based in MEA's New York office. *Id.* Lu advised Ali to file a complaint with DOE and explained

---

[4] The complaint alleges that the defendants have since referred to this email as "Mr. Andrew's email" and that this refers to Andrew Starr, AUA's vice president of student financial services. Doc. 25 ¶ 22. Starr is based in MEA's New York office. *Id.*

[5] Specifically, the defendants stated, "The U.S. Department of Education has required that AUACOM cancel your Title IV disbursements from your [Fall 2023] semester." *Id.* at 11 ¶ 19.

that she believed the situation was "odd" and "not right." *Id.* Since then, Ali has not been able to contact Lu; the defendants report that she no longer works for them. *Id.*

Over the next several months, Ali continued to reach out to the defendants for clarification regarding his tuition balance. *Id.* ¶ 26. Their responses were often delayed by multiple weeks; they also included conflicting instructions. *Id.* At some point, the defendants also directed Ali to complete forms for late loan disbursement. *Id.* Although Ali now alleges that these forms were unnecessary—and that the defendants knew that— Ali did not know that the forms were unnecessary at the time. *Id.* When Ali sent a letter to the defendants seeking further clarification regarding his loan status and for his degree to be released, he never received a written response. *Id.* ¶ 33. Instead, AUA's associate vice principal of financial aid, Margherite Powell, called Ali and reiterated that the DOE had mandated that his federal loans be cancelled. *Id.*

Throughout these communications, Ali believed that the defendants were acting in good faith. *Id.* Thus, he continued to follow their instructions and seek clarification from them. *Id.* But, in the intervening months, his inability to obtain his diploma and official transcript negatively impacted his career prospects. *Id.* ¶ 34. For example, without these documents, he was unable to obtain certification from the Educational Commission for Foreign Medical Graduates ("ECFMG") to begin a U.S. residency program. *Id.* ¶ 36; Doc. 37 at 22.[6] This, in turn, impacted his ability to "match" into a residency program. *Id.* ¶ 36; Doc. 37 at 22. In general, the residency matching process includes two phases: an initial match process where applicants rank their preferences for programs and a subsequent Supplemental Offer and Acceptance Program ("SOAP") for applicants who do not match or only partially match during the initial process. Doc. 37 at 22. A partial match can occur when an applicant seeks residency in certain specialties that bifurcate

---

[6] Ali includes additional factual allegations regarding this certification in his opposition brief. *See* Doc. 37 at 22–23. Because he is *pro se,* the Court may consider these allegations, so long as they are consistent with the complaint. *Walker v. Schult,* 717 F.3d 119, 122 n.1 (2d Cir. 2013); *Vlad-Berindan v. MTA New York City Transit,* No. 14 Civ. 675 (RJS), 2014 WL 6982929, at *6 (S.D.N.Y. Dec. 10, 2014).

their training programs. *Id.* Residents in these specialties must not only complete an "advanced" program that is focused on that specialty, but also a "preliminary" position prior to that program. *Id.* Thus, it is common for applicants in these specialties to match with an "advanced" program during the initial process and seek a "preliminary" position through SOAP. *Id.*

Ali found himself in that position during his own residency matching process. *Id.* During the initial match process in September 2024, he secured a "highly competitive" advanced radiology position. *Id.* at 21–22. Because is not uncommon for international graduates to have not yet received ECFMG certification or their diplomas while they are participating in the initial match process, Ali's failure to obtain either "was not yet considered a red flag." *Id.* at 21. But, by the time that he sought a preliminary position during SOAP in Spring 2025, his "lack of certification was definitely a red flag." *Id.* For example, during SOAP interviews between March 17 and 21, 2025, Ali was repeatedly asked about his lack of ECFMG certification. *Id.* at 22–23; Doc. 25 ¶ 28. He was also asked whether he had graduated from medical school. Doc. 37 at 23. As a result, Ali was forced to admit during his interviews that his medical school was withholding his diploma. Doc. 37 at 22–23.

Ali ultimately failed to match with a preliminary position through SOAP. Doc. 25 ¶ 28. This, in turn, jeopardized his ability to participate in the advanced position that he had already secured, because that residency was conditioned upon the completion of a preliminary year. Doc. 37 at 23. To avoid any further damage to his career prospects, Ali was "forced" to apply for a private loan to cover his tuition bill on March 24, 2025. Doc. 25 ¶ 34. Because the loan was privately administered, it did not provide certain benefits that are available to federal student loan borrowers, like income-driven repayment plans or the Public Service Loan Forgiveness program. *Id.* ¶ 35. Sometime after he received the loan, the defendants released his diploma and official transcript, and Ali received his ECFMG certification. *Id.* ¶ 39; Doc. 37 at 6. He received an offer for a residency

position in Lexington, Kentucky days later. Doc. 25 ¶ 39. Because this was the only post-match residency position that was available, Ali was "forced" to accept it, notwithstanding that it was in a less desirable location and far from his family, who live in New Jersey. *Id.*; Doc. 37 at 6–7.

Ali alleges that, contrary to the defendants' representations, the DOE had not required the cancellation of his federal loans,[7] and that he was charged a tuition balance simply because the defendants—having been placed on the HCM2 payment method— were required to but failed to request reimbursement for his loans from the DOE. Doc. 25 ¶ 3. Indeed, representatives from the office of Federal Student Aid ("FSA") shared with Ali that AUA had not submitted any requests for federal loans on his behalf since 2023 and advised him to file a complaint with the DOE.[8] *Id.*

Ali alleges that the defendants chose not to submit a reimbursement request because it would have triggered scrutiny from the DOE regarding unresolved compliance issues. *Id.* ¶ 4. He also alleges that the defendants fabricated the tuition balance and the DOE mandate to avoid submitting a reimbursement request, because the DOE would have denied the request and Ali would have been notified about the denial and thus the defendants' failure to process his loans in the first place. *Id.* Ali contends that this conduct violated, *inter alia*, the defendants' implied promise to process his federal student aid, as outlined in AUA's Financial Aid Student Loan Guide.[9]

---

[7] Indeed, the Federal Student Aid ("FSA") office has confirmed to Ali that no such mandate from the DOE existed. Doc. 25 ¶ 24. The complaint does not identify when this communication took place. *Id.* ¶ 24.

[8] Ali followed the FSA's advice and filed a complaint with the DOE. *Id.* ¶ 25. That complaint was still pending as of the filing of the amended complaint. *Id.*

[9] The guide states, among other things, that AUA's "Verification Counselors review all the applications and documents required to successfully process [students'] financial aid" and that "Confirmation Counselors will package [students'] loans, i.e., put together [their] award letter[s], after [they] have been successfully verified." *Id.* at 20. It further states that, after "the processing of [a student's] applications and [the student's] receipt of an award letter, . . . [AUA's] Bursar's Office will credit [the student's] account for tuition, fees, and other institutional charges within three business days of receiving the funds, and disburse any credit balance to [the student] within 14 days." *Id.* at 21.

## II.    PROCEDURAL HISTORY

Ali filed a complaint against the defendants on March 6, 2025.[10]  Doc. 1.  The Court, in an order issued by Chief Judge Swain, to whom the case was previously assigned, dismissed the complaint *sua sponte* for lack of subject matter jurisdiction on March 24, 2025.  Doc. 11.  It also granted Ali thirty days' leave to file an amended complaint.  *Id.*  Ali filed an amended complaint on April 1, 2025, and the case was reassigned to the undersigned on April 4, 2025.  Doc. 12.  Ali further amended his complaint on August 4, 2025, Doc. 25, asserting claims for:  (1) breach of contract, (2) fraudulent misrepresentation and concealment, (3) tortious interference with prospective economic advantage, (4) conversion, (5) violation of New York General Business Law § 349, (6) violation of New York Education Law § 640, and (7) violation of the Due Process Clause of the United States Constitution.  *Id.* at 9–14.  The defendants moved to dismiss the second amended complaint for lack of subject matter jurisdiction and failure to state a claim on August 29, 2025, Doc. 36.  The motion is fully briefed.  Docs. 37, 38.

## III.    LEGAL STANDARDS

### A.  *Pro Se* Litigants

The Court holds submissions by *pro se* litigants to "less stringent standards than formal pleadings drafted by lawyers."  *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)); *see also Young v. New York City Department of Education*, No. 09 Civ. 6621 (SAS), 2010 WL 2776835, at *5 (S.D.N.Y. July 13, 2010) (noting that the same principles apply to briefs and opposition papers filed by *pro se* litigants).  Although "*pro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law,'" *Triestman v. Federal Bureau of*

---

[10]  Ali also filed an application for a preliminary injunction and temporary restraining order on the same day, in which he sought an order compelling the defendants to immediately release his medical diploma and official transcript.  Doc. 6.  Although the parties do not address this application in their briefs, it is undisputed that Ali has since received his diploma and transcript.  Doc. 37 at 22.  Thus, the application is moot.

*Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)), courts read the pleadings and opposition papers submitted by *pro se* litigants "liberally and interpret them 'to raise the strongest arguments that they suggest,'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

### B.  Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) requires that an action be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate the case.  Fed.R.Civ.P. 12(b)(1).  The party asserting subject matter jurisdiction carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists.  *See Morrison v. National Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008).  When evaluating a motion to dismiss for lack of subject matter jurisdiction, the court accepts all material factual allegations in the complaint as true but does not necessarily draw inferences from the complaint favorable to the plaintiff.  *J.S. ex rel. N.S. v. Attica Central Schools*, 386 F.3d 107, 110 (2d Cir. 2004).

Where, as here, a party also seeks dismissal on Rule 12(b)(6) grounds, the court must consider the Rule 12(b)(1) motion first, *Baldessarre v. Monroe-Woodbury Central School District*, 820 F. Supp. 2d 490, 499 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 131 (2d Cir. 2012), because "disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction." *Chambers v. Wright*, No. 05 Civ. 9915 (WHP), 2007 WL 4462181, at *2 (S.D.N.Y. Dec. 19, 2007) (quoting *Magee v. Nassau County Medical Center*, 27 F. Supp. 2d 154, 158 (E.D.N.Y. 1998)).

### C.  Rule 12(b)(6)

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6).  When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See Koch v.*

8

*Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court is not required, however, to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (citation modified).

## IV.  DISCUSSION

### A.  Subject Matter Jurisdiction

The defendants first move to dismiss the complaint[11] for lack of subject matter jurisdiction. Ali invokes the Court's federal question and diversity jurisdiction. Doc. 25 ¶¶ 8–9. The Court addresses each in turn.

### 1.  *Federal Question Jurisdiction*

A district court may exercise subject matter jurisdiction if the action "aris[es] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. An action "arises under federal law" if "a well-pleaded complaint establishes that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 690 (2006). Moreover, "federal claims that are not colorable, *i.e.*[,] immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and frivolous, do not give rise to federal-question jurisdiction." *Gallego v. Northland Group Inc.*, 814 F.3d 123, 126 (2d Cir. 2016) (citation modified). A claim "fails to raise a colorable federal question" when it is "foreclosed by Supreme Court or Second Circuit precedent." *Id.* at 128.

---

[11] The second amended complaint is the operative complaint. For clarity, the Court refers to the operative complaint simply as the complaint.

The defendants contend that Ali has failed to establish federal question jurisdiction because his Fifth Amendment claim is "obviously without merit." Doc. 36-1 at 4. In support of this claim, the complaint invokes both 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *See* Doc. 25 at 10.

Because Ali's *Bivens* claim is asserted against two private entities, it fails to raise a colorable federal question under federal law. Indeed, as the defendants note, Doc. 36-1 at 5, the Supreme Court explicitly "foreclose[d] the extension of *Bivens* to private entities" over two decades ago in *Correctional Services Corporation v. Malesko*, 534 U.S. 61, 66 n.2 (2001).[12] Thus, Ali's *Bivens* claim is "patently without merit" and cannot support the Court's exercise of its federal question jurisdiction.[13] *Perpetual Securities, Inc. v. Tang*, 290 F.3d 132, 139 (2d Cir. 2002) (quoting *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 70 (1978)); *see also Lewis v. Bureau of Alcohol, Tobacco & Firearms*, No. 16 Civ. 1057 (RPK) (TAM), 2021 WL 2576731, at *3 (E.D.N.Y. June 23, 2021) (distinguishing between cases in which a court is asked to imply a *Bivens* remedy in an arguably new context and those in which the invocation of *Bivens* in that context is clearly frivolous).

In his opposition brief, Ali does not discuss his alternate theory that the defendants are liable pursuant to Section 1983 and thus appears to abandon that claim.

---

[12] Although Ali argues that the holding in *Malesko* should be limited to its facts, Doc. 37 at 4–5, the Supreme Court's holding regarding private-entity defendants was clearly categorical. It explained that although the "Courts of Appeals have divided on whether *FDIC v. Meyer*, forecloses the extension of *Bivens* to private entities[,] [it] hold[s] today that it does." *Malesko*, 534 U.S. at 66 n.2 (citations omitted).

[13] In his opposition brief, Ali argues that the "question of whether a *Bivens* remedy is ultimately available against private entities addresses the merits of [his] claim, not the Court's subject matter jurisdiction." Doc. 37 at 3. In support of this contention, he notes that the Supreme Court has recognized that "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998). But that principle only applies where a plaintiff's "invocation of *Bivens* is not frivolous." *Lewis v. Bureau of Alcohol, Tobacco & Firearms*, No. 16 Civ. 1057 (RPK) (TAM), 2021 WL 2576731, at *3 (E.D.N.Y. June 23, 2021). And here, Ali's invocation is frivolous because it is explicitly foreclosed by Supreme Court precedent.

*See* Doc. 37 at 3–6. But even assuming that Ali still intends to rely on this theory, it too would be insufficient to establish federal question jurisdiction. Section 1983 grants a right of action to any "citizen of the United States or other person within the jurisdiction thereof" who has been deprived of "any rights, privileges, or immunities secured by the Constitution" or federal law by a person acting under color of *state* law. 42 U.S.C. § 1983. Thus, to state a claim under Section 1983, a plaintiff must allege that the defendants were state actors[14] or were acting under color of state law at the time of the alleged wrongful action. *American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). Here, however, the complaint is devoid of any allegations regarding the exercise of any *state* law authority. Rather, it repeatedly alleges that the defendants' conduct "constitut[ed] action under color of *federal* law." Doc. 25 at 10 ¶ 14 (emphasis added); *see also, e.g., id.* at 10 ¶ 12 (alleging that the defendants "exercised discretionary authority conferred by federal law"). Because this conduct plainly falls outside of the scope of Section 1983, Ali's claim is "patently without merit."[15] *Tang*, 290 F.3d at 139. Thus, the Court lacks jurisdiction to consider it. *See Owoyemi ex rel. PDP-USA Chapter Executive Members v. Wariboko*, No. 05 Civ. 1789 (CPS), 2005 WL 1241133, at *3 (E.D.N.Y. May 23, 2005).

In his brief, Ali offers one additional argument in support of federal question jurisdiction. He contends that, even if his due process claim does not suffice to establish federal question jurisdiction, his state law claims for breach of contract, fraud, and tortious interference do. Doc. 37 at 5. He says that is so because those claims

---

[14] The term "state actor" includes both local and state level officials and entities. *See Monell v. Department of Social Services*, 436 U.S. 658, 690–91 (1978).

[15] It also appears that the Section 1983 claim is "immaterial and made solely for the purpose of obtaining jurisdiction." *Gallego*, 814 F.3d at 126. Indeed, Ali amended his complaint to include this claim only after the Court identified it as a potential vehicle for his due process claim but nonetheless dismissed the claim because the complaint "allege[d] nothing to suggest that [the defendants] have conducted themselves as state actors." Doc. 11 at 6 n.11. And in his opposition brief he argues only that the defendants' actions were taken "under color of federal law," based on the *Bivens* theory that the Court has already concluded is frivolous. Doc. 37 at 4–5.

11

"necessarily depend on the resolution of federal issues, namely, how Title IV/HCM2 operates and whether [the] [d]efendants misused federal disbursement authority." *Id.* at 6. This argument lacks merit.

In general, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013). Thus, it is not enough that a federal question is "necessarily raised" by a plaintiff's state law claim. A plaintiff must also satisfy the remaining jurisdictional prerequisites.

And here, Ali fails at the second step of the inquiry: he cannot show that any federal issue is "actually disputed" in this case. *Id.* "[A] federal issue is 'actually disputed' when the parties 'have a dispute respecting the effect of federal law.'" *New York by James v. MoneyLion Inc.*, No. 25 Civ. 4093 (CM), 2025 WL 3154497, at *4 (S.D.N.Y. Nov. 12, 2025) (quoting *Gunn*, 568 U.S. at 259). The problem for Ali is that the parties do not dispute the effect of any federal law in this case. Ali alleges that, "[u]nder HCM2, schools must disburse aid from their own funds and then request reimbursement later," Doc. 25 ¶ 4, and the defendants agree, Doc. 36-1 at 2 ("In brief, institutions on HCM2 credit the students first, and then later must apply to the Department for reimbursement." (citing Doc. 25 ¶ 4)). The only question regarding this mandate is whether the defendants did, in fact, request reimbursement from the DOE. Because this purely factual question does not require the construction of any federal law, it cannot support the exercise of federal question jurisdiction.[16] *See NASDAQ OMX Group, Inc. v. UBS Securities, LLC*, 770 F.3d 1010, 1021 (2d Cir. 2014) (explaining that a

---

[16] In any event, the Court may not exercise federal question jurisdiction over these claims because any federal issue with respect to them is not "substantial." *See Gunn*, 568 U.S. at 263–64 (explaining that where the resolution of the federal issue would have only "'fact-bound and situation-specific' effects" on the parties, the exercise of federal question jurisdiction is not proper because "something more, demonstrating that the question is significant to the federal system as a whole, is needed" (quoting *McVeigh*, 547 U.S. at 701)).

federal issue is actually disputed where a "dispute as to the violation of [a federal] duty . . . will require construction of a federal statute" (emphasis omitted)); *New York ex rel. Jacobson v. Wells Fargo National Bank, N.A.*, 824 F.3d 308, 316 (2d Cir. 2016) (holding that a federal "issue is obviously disputed[] [where] the central premise of [the] motion to dismiss was that the trusts did qualify under federal law, properly interpreted").

In sum, none of Ali's claims properly rely on the Court's federal question jurisdiction.

### 2. Diversity Jurisdiction

Ali also invokes the Court's diversity jurisdiction. To establish a court's diversity jurisdiction, a plaintiff must satisfy two requirements. First, "the case must be between 'citizens of different States' or 'citizens of a State and citizens or subjects of a foreign state,' such that there is complete diversity of citizenship between every plaintiff and every defendant." *Windward Bora LLC v. Browne*, 110 F.4th 120, 125–26 (2d Cir. 2024) (quoting 28 U.S.C. § 1332(a)(1), (2)). "An individual's citizenship, within the meaning of the diversity statute, is determined by his domicile." *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 42 (2d Cir. 2000). "[A] corporation is considered a citizen of the state in which it is incorporated and the state of its principal place of business." *Bayerische Landesbank v. Aladdin Capital Management LLC*, 692 F.3d 42, 48 (2d Cir. 2012). And a limited liability company has the citizenship of its membership. *Handelsman v. Bedford Village Associates Ltd. Partnership*, 213 F.3d 48, 51–52 (2d Cir. 2000).

Here, the complaint sufficiently pleads that all adverse parties are completely diverse: Ali is a domiciled in New Jersey, Doc. 25 ¶ 5, AUA is incorporated in Florida and headquartered in Antigua and Barbuda, *id.* ¶ 10, and MEA's sole member is incorporated in Mauritius, *id.* ¶ 7. Because all adverse parties are citizens of different states or foreign states, the complete diversity requirement is therefore satisfied.

Second, a plaintiff must demonstrate to a "reasonable probability that the claim is in excess of the statutory jurisdictional amount" of $75,000. *Tongkook America, Inc. v.*

13

*Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994) (internal quotations omitted). The Second Circuit recognizes "a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 223 (2d Cir. 2017) (quoting *Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006)). However, "[a] defendant may rebut that presumption by demonstrating to a legal certainty that the plaintiff could not recover the amount alleged or that the damages alleged were feigned to satisfy jurisdictional minimums." *Id.* (internal quotations omitted). In further defining the legal certainty standard, the Second Circuit has held that "the legal impossibility of recovery must be so certain as virtually to negat[e] the plaintiff's good faith in asserting the claim. If the right of recovery is uncertain, the doubt should be resolved . . . in favor of the subjective good faith of the plaintiff." *Chase Manhattan Bank, N.A. v. American National Bank & Trust Co. of Chicago*, 93 F.3d 1064, 1070 (2d Cir. 1996) (quoting *Tongkook*, 14 F.3d at 785–86). Establishing legal certainty as a matter of law is thus a high bar for overcoming the presumption that the amount in controversy has been asserted in good faith. *See Klika v. Tuckahoe Police Organization, Inc.*, No. 18 Civ. 5031 (NSR), 2020 WL 2097606, at *5, (S.D.N.Y. May 1, 2020). "Even where the allegations leave grave doubt about the likelihood of a recovery of the requisite amount, dismissal is not warranted." *Scherer v. Equitable Life Assurance Society of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003) (quoting *Zacharia v. Harbor Island Spa, Inc.*, 684 F.2d 199, 202 (2d Cir. 1982)).

Here, the amount-in-controversy requirement presents a more difficult question. The complaint seeks: (1) $53,548 in damages based on the private loan that Ali received, along with a 2.5% origination fee and the 7% compound interest that has accrued since March 24, 2025; (2) "at least $70,000 in consequential damages for lost career opportunities, including lost wages due to [Ali's] inability to begin residency"; and (3) "punitive damages based on [the] [d]efendants' intentional fraud, coercion, civil rights violations, and interference with [Ali's] career." Doc. 25 ¶ 9.

The defendants contend that Ali has not shown that his claims exceed $75,000. Doc. 36-1 at 6. As to the loan-related damages, they argue that Ali cannot claim the entire principal of the private loan because he always sought to borrow the same amount from the DOE. Doc. 26-1 at 6–7. Ali does not dispute that he intended to borrow the same amount in federal loans and for good reason—the complaint plainly demonstrates that he did. *See* Doc. 25 ¶¶ 34–35 (alleging that Ali "was forced to apply for a private loan . . . [and] forfeit eligibility for federal loan benefits and protections"). Thus, at most, the only damages that Ali can claim from the loan itself must arise from any differences between the private loan and the federal loan that Ali alleges was otherwise available to him. But, as the defendants note—and Ali does not dispute—the terms of Ali's private loan were at least as favorable as those offered by the federal government.[17] *See* Doc. 36–1 at 10 n.3; 88 Fed. Reg. 82863 (Nov. 27, 2023) (noting that federal direct unsubsidized and direct PLUS loans carried 7.05% and 8.05% interest rates, respectively); U.S. Department of Education, *FY 24 Sequester-Required Changes to the Title IV Student Aid Programs* (May 15, 2023) (noting a 1.057% fee for direct unsubsidized loans and a 4.228% fee for direct PLUS loans). Thus, at best, any damages based on the private loan are negligible.

---

[17] Although, in his opposition brief, Ali also contends that the "value of lost [public service loan forgiveness] or income-driven repayment eligibility" should be counted toward the amount in controversy, his complaint is devoid of any allegations regarding the value of these benefits. Doc. 37 at 15. In fact, he concedes that determining the "precise monetary value" of the "forfeiture of these benefits" likely requires "speculat[ion]." *Id.* But "[t]he basis for the amount in controversy should not be grounded in sheer speculation by the Court . . . ." *Stinnett v. Delta Air Lines, Inc.*, No. 18 Civ. 1416 (DLI) (RML), 2018 WL 1582221, at *2 (E.D.N.Y. Mar. 29, 2018) (quoting *Audi of Smithtown, Inc. v. Volkswagen of America, Inc.*, 2009 WL 385541, at *8 (E.D.N.Y. Feb. 11, 2009)). That is especially true here, given the absence of any allegations that suggest that Ali intended to seek loan forgiveness in first place—let alone that he would be eligible for this relief under the specific requirements that apply such applications. *See, e.g.*, 34 C.F.R. § 685.219 (outlining eligibility requirements for the public service loan forgiveness program); 34 C.F.R. § 685.401 (outlining requirements for borrower defense discharge); *see Daun v. Bob's Discount Furniture, LLC*, No. 2:25 Civ. 06513 (NJC) (LGD), 2026 WL 412383, at *2 (E.D.N.Y. Feb. 13, 2026) ("The amount in controversy alleged must be plausible, *i.e.*, supported by factual allegations in the complaint."). Thus, Ali's claim that he is entitled to damages based on the loss of eligibility for certain federal student loan benefits is entirely speculative.

The defendants also challenge Ali's assertion that he is entitled to "at least $70,000 in consequential damages for lost career opportunities, including lost wages due to his inability to begin residency." Doc. 25 ¶ 9. They argue that Ali cannot recover that amount because it represents the total salary he expected to receive in his preliminary residency year, and Ali alleges that he secured a replacement preliminary residency with a $64,000 salary in Lexington, Kentucky.[18] Doc. 36-1 at 7.

In his opposition brief, Ali concedes that, because he obtained a replacement position, he is not entitled to his full expected salary. Doc. 37 at 7. He argues, however, that, even accounting for the salary that he eventually received, he is still entitled to claim at least $19,200, because he received at least $6,000 less in salary from his replacement position and has had to pay another $13,200 in rent in Kentucky.[19] *Id.* Although these facts are not alleged in the complaint, because they are consistent with the complaint's allegations and Ali is *pro se*, the Court may consider them. *Vlad-Berindan v. MTA New York City Transit*, No. 14 Civ. 675 (RJS), 2014 WL 6982929, at *6 (S.D.N.Y. Dec. 10, 2014). Thus, Ali may rely on this good faith estimate to satisfy the jurisdictional requirement. *Pyskaty*, 856 F.3d at 223. And though the defendants argue that Ali has not shown that they were the but-for cause of these damages, this contention flips the amount-in-controversy inquiry. Doc. 38 at 4. Ali has offered a good faith estimate of his damages and plausibly supported this estimate with factual allegations. *See* Doc. 37 at 7–8, 21–23. To rebut this estimate, the *defendants* must "demonstrat[e] to a legal certainty that [Ali] could not recover the amount alleged or that the damages alleged were feigned to satisfy jurisdictional minimums." *Pyskaty*, 856 F.3d at 223. Thus, the defendants'

---

[18]  In their reply, the defendants also suggest that because Ali "could easily have rectified the situation" before his residency interviews, he should not be able to claim damages based on his failure to obtain a higher-paying residency. Doc. 38 at 5. This argument is waived, however, because it was raised for the first time in their reply brief. *Morgan v. McElroy*, 981 F. Supp. 873, 876 n.3 (S.D.N.Y. 1997).

[19]  Ali alleges that he pays this rent in addition to the mortgage that he pays for the house that his wife and children live in in New Jersey—where he presumably would have lived in had he received a preliminary residency in New York. Doc. 37 at 7.

assertion that Ali has not ruled out all other possible causes for his damages misunderstands the inquiry: it is their burden, given Ali's good faith estimate, to show that he cannot recover this amount to a legal certainty. *See Chase Manhattan Bank, N.A.*, 93 F.3d at 1070 ("If the right of recovery is uncertain, the doubt should be resolved . . . in favor of the subjective good faith of the plaintiff."). Because they have not done so, the Court may rely on Ali's estimate of $19,200.

Of course, $19,200 still falls far below the $75,000 requirement. Thus, Ali's ability to establish diversity jurisdiction must depend on his claim for punitive damages. *See Peoples Club of Nigeria International, Inc. v. Peoples Club of Nigeria International - New York Branch, Inc.*, 821 F. App'x 32, 35 (2d Cir. 2020) ("Punitive damages available under state law can help a plaintiff meet the jurisdictional requirement even where they make up the bulk of the amount in controversy."). *But see Zahn v. International Paper Co.*, 469 F.2d 1033, 1033 n.1 (2d Cir. 1972), *aff'd*, 414 U.S. 291 (1973) ("[I]n computing [the] jurisdictional amount, a claim for punitive damages is to be given closer scrutiny, and the trial judge accorded greater discretion, than a claim for actual damages.").

The defendants argue that Ali cannot show that he is entitled to punitive damages because the "complaint lacks specific allegations sufficient to establish [that] AUA's or MEA's actions toward [Ali] . . . constitute wanton and reckless or malicious behavior toward [him]." Doc. 36-1 at 8; *see In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 725 F.3d 65, 127 (2d Cir. 2013) (explaining that, in New York, "[p]unitive damages are appropriate where the defendant 'acted with actual malice involving an intentional wrongdoing' or where such conduct amounted to a 'wanton, willful or reckless disregard of plaintiffs' rights.'" (quoting *Ligo v. Gerould*, 665 N.Y.S.2d 223, 224 (4th Dep't 1997))).

In his complaint, however, Ali alleges that the defendants knew that he was eligible for federal loans and that they were obligated to request reimbursement for those loans but abstained from doing so solely to avoid further regulatory scrutiny. Doc. 25

17

¶¶ 3–4, 13, 21, 24. He also alleges that the defendants intentionally concealed these facts from Ali, including through claiming that Ali was not eligible for federal loans, fabricating an explanation that the DOE required the cancellation of his loans, and providing conflicting and unnecessary instructions over the course of many months regarding the remedial steps that Ali should take to resolve the issue. *Id.* ¶¶ 26–27, 29, 33. The complaint also alleges that the defendants were aware that Ali needed his diploma and transcript to "become ECFMG certified in time for the residency match process" and timed their lies to "maximize[] coercive pressure [on Ali to obtain a private loan] while minimizing [his] ability to respond or seek alternatives," thus "shifting liability for [their] regulatory failure onto" Ali. *Id.* ¶¶ 3–4, 9, 25. And it alleges that the defendants subjected over a hundred students to the same misrepresentations. *Id.* ¶¶ 35, 38. In light of these allegations, the Court cannot conclude to a "legal certainty" that Ali cannot recover punitive damages and thus satisfy the amount-in-controversy requirement. *Peoples Club of Nigeria*, 821 F. App'x at 36; *see also Carlin v. United Healthcare Insurance Co. of New York, Inc.*, No. 24 Civ. 8435 (JMF), 2025 WL 3241162, at *2 (S.D.N.Y. Nov. 20, 2025) ("Although there are reasons to be skeptical that Plaintiffs will be able to recover punitive damages here, the 'record does not foreclose th[e] possibility' of such damages." (quoting *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 89 (2d Cir. 1991))). Thus, at this stage of the proceedings, Ali has established diversity jurisdiction over his state law claims.

### B. Failure to State a Claim

The defendants argue that, even if the Court has subject matter jurisdiction, the complaint should be dismissed pursuant to Rule 12(b)(6). For the reasons set forth below, the motion is granted in part and denied in part.

#### 1. Breach of Contract

"Under New York law, an implied contract is formed when a university accepts a student for enrollment: if the student complies with the terms prescribed by the

university and completes the required courses, the university must award him a degree." *Papelino v. Albany College of Pharmacy of Union University*, 633 F.3d 81, 93 (2d Cir. 2011). "The rights and obligations of the parties as contained in the university's bulletins, circulars and regulations made available to the student[] become a part of this contract." *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 421 (S.D.N.Y. 2021) (quoting *Vought v. Teachers College, Columbia University*, 511 N.Y.S.2d 880, 881 (2d Dep't 1987)). "At the same time, 'the student must fulfill [his] end of the bargain by satisfying the university's academic requirements and complying with its procedures.'" *Papelino*, 633 F.3d at 93 (quoting *Gally v. Columbia University*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998)).

"The essence of the implied contract is that an academic institution must act in good faith in its dealings with its students." *Olsson v. Board of Higher Education*, 49 N.Y.2d 408, 414 (1980). This duty of good faith encompasses "any promises which a reasonable person in the position of the [student] would be justified in understanding were included," including the promise that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389 (1995). Thus, where an implied contract between a school and student "contemplates the exercise of [the school's] discretion," the duty of good faith prohibits the school from "act[ing] arbitrarily or irrationally in exercising that discretion." *Id.*

"In general, to sustain a contract claim against a university, a student must point to a provision that guarantees 'certain specified services,' not merely to a '[g]eneral statement[] of policy,' or to statements of 'opinion or puffery.'" *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d at 421 (first quoting *Baldridge v. State*, 740 N.Y.S.2d 723, 725 (3d Dep't 2002); then *Keefe v. New York Law School*, No. 109484/09, 2009 WL 3858679, at *1 (N.Y. Sup. Ct. 2009); and *Bader v. Siegel*, 657 N.Y.S.2d 28, 29 (1st Dep't 1997)); *see generally id.* at 422 (collecting cases in which courts have found that

19

promises are or are not sufficiently specific).  Thus, "the mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim on which relief can be granted."  *Gally*, 22 F. Supp. 2d at 207.

Under these standards, Ali has stated a claim for breach of contract.  First, Ali plausibly alleges the existence of an implied contract with the defendants.  Because, in New York, "the existence of an implied contract is a question of fact," the Court's inquiry with respect to this question is narrow:  the Court asks only "whether a reasonable factfinder *could* conclude that [Ali's] plausible allegations demonstrate an implied contract to provide [certain] services."  *Rynasko v. New York University*, 63 F.4th 186, 197 (2d Cir. 2023).

Here, Ali alleges that an implied contract existed that included a promise that the defendants would process his federal student aid.  Doc. 37 at 15.  Because this allegation identifies a "specific breached promise," rather than generalized "allegation of mistreatment," it is actionable under New York law.  *Gally*, 22 F. Supp. 2d at 207.  The existence of this implied contract is also plausibly supported by Ali's reference to "guarantees" in university materials to provide these "specified services."  *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d at 421; *see also id.* at 422 (noting that "courts have rejected claims based on more general promises" like promises "to provide a great learning environment for adult students" or "to provide supervision and teaching by honest and unbiased instructors").  Ali highlights, in particular, that AUA's Financial Aid Student Loan Guide states that "Verification Counselors review all the applications and documents required to successfully process your financial aid," "Confirmation Counselors will package your loans, i.e., put together your award letter, after you have been successfully verified," and that, after "the processing of your applications and your receipt of an award letter, . . . [t]he Bursar's Office will credit your account for tuition, fees, and other institutional charges within three business days of receiving the funds, and disburse any credit balance to you within 14 days."  Doc. 25 at 20–21.  In light of these

allegations, a reasonable factfinder could conclude that the defendants entered an implied contract to process federal student aid through its financial aid application and disbursement process. Thus, the existence of this implied contract is plausible.

Ali has also plausibly alleged that the defendants breached this obligation. As set forth above, the complaint alleges that, to process federal student aid under HCM2, the defendants were required to first credit Ali's account and then request reimbursement from the DOE. And it alleges that the defendants credited his account but purposefully failed to request reimbursement from the DOE. Accepting these facts as true, it is plausible that, in failing to request reimbursement, the defendants breached their promise to process Ali's federal student aid. At the very least, these allegations plausibly suggest that, in processing Ali's federal student aid, the defendants acted arbitrarily and thus violated their duty of good faith. *Dalton*, 87 N.Y.2d at 389.

In resisting this conclusion, the defendants emphasize that "[n]either AUA nor MEA is a lender of federal funds," and the "authority to make a final decision regarding an individual's eligibility for federal financial aid rests entirely with" the DOE. Doc. 38 at 7. Thus, they argue that there is no evidence of "any unconditional promise by AUA to obtain or provide a federal student loan to" Ali. *Id.* While that is invariably true, it misunderstands the nature of the implied contract alleged here. Here, Ali does not allege that the defendants promised to obtain a federal loan for him, regardless of whether he was deemed eligible by the DOE. Rather, he asserts that they promised to do their part to process his federal student aid request, including through requesting reimbursement from the DOE, and failed to follow through on that commitment.[20] And for the reasons already explained, the Court concludes that—at least at this stage of the proceedings— that allegation is plausible. Thus, Ali has stated a claim for breach of contract.

---

[20] The Court also notes that the defendants do not argue that Ali failed to comply with the AUA's financial aid procedures such that he failed to "fulfill [his] end of th[is] bargain." *Papelino*, 633 F.3d at 93.

### 2. *Fraudulent Misrepresentation & Concealment*

In Count III, Ali asserts a claim for fraudulent misrepresentation and concealment. Doc. 25 at 11. Because, in New York, these are separate claims with different elements, *Lazard Freres & Co. v. Protective Life Insurance Co.*, 108 F.3d 1531, 1452 (2d Cir. 1997), the Court addresses each claim separately.

A claim of common law fraudulent misrepresentation has five elements: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock and Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006). "Additionally, to establish fraudulent concealment, under New York law, a plaintiff must also allege that the defendant had a duty to disclose the material information and that it failed to do so." *Spencer v. Omega Laboratories Inc.*, No. 20 Civ. 03747 (JMA) (ARL), 2024 WL 3675856, at *22 (E.D.N.Y. Aug. 6, 2024). Parties alleging fraud must also comply with the heightened pleading standards of Federal Rule of Civil Procedure 9(b). Specifically, Rule 9(b) requires that a fraud claim must identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012). Conditions of a person's mind—such as malice, intent, or knowledge—may be alleged generally. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).

### a. *Fraudulent Misrepresentation*

Ali alleges that the defendants made two fraudulent misrepresentations. First, he contends that they "falsely reported the receipt of federal Title IV loans on [his] daily billing statements from October 2023 to November 2024, indicating $9,290 in Federal Unsubsidized Loans and $44,258 in Federal Grad PLUS Loans for the [relevant] semester." Doc. 37 at 16. But, as the defendants note, HCM2 requires schools to credit a student's account with the Title IV funds he is eligible to receive before they seek

22

reimbursement.  Doc. 36-1 at 13; 34 CFR § 668.162(d).  Thus, the more likely and obvious alternative explanation is that his billing statements merely reflected this credit.  *See Iqbal*, 556 U.S. at 681–82 (holding that allegations that are merely "consistent" with liability do not support a "plausible" inference of liability where there is a "more likely" and "obvious alternative explanation" for the conduct alleged).  These statements, though perhaps consistent with liability, therefore cannot support a plausible claim for relief.

Second, Ali claims that, on November 18, 2024, the defendants "abruptly fabricated a tuition bill and falsely claimed that the U.S. Department of Education had 'required' the retroactive cancellation of [his] loans."  Doc. 37 at 16–17.  The defendants argue that these statements cannot support a misrepresentation claim because Ali's allegations regarding these statements are conclusory—insofar as they are "limited to a single paragraph"—and fail to satisfy Rule 9(b)'s particularity requirement—because they "attribute[] statements to an unnamed employee at the Department of Education."  Doc. 36-1 at 14.  But the allegations in that "single paragraph" are far from conclusory—they include that the FSA confirmed to Ali that the DOE had not mandated the cancellation of his loans, while also sharing that AUA had not submitted any requests for federal loans on Ali's behalf since 2023.[21]  Doc. 25 ¶ 24.  In the subsequent paragraph, Ali also alleges that FSA representatives advised him to file a complaint with the DOE, which was "escalated" to the DOE's ombudsman and is pending review.  *Id.* ¶ 25.  And while it's true that the complaint attributes these statements to unnamed "FSA representatives," Ali does not allege that the FSA representatives' statements were themselves fraudulent.  Thus, Rule 9(b) does not require that he plead those statements

---

[21]  The defendants also argue that Ali's allegation that AUA has not submitted any loan requests "since 2023" is only consistent with their liability for fraudulent misrepresentation.  Doc. 36-1 at 14.  But, on a motion to dismiss, a court must consider whether "*all* of the facts alleged, taken collectively," render the claim plausible, "not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).  And the additional facts that Ali alleges regarding his conversations with the FSA render his claim regarding the DOE's purported cancellation of his loans plausible.  *See* Doc. 25 ¶¶ 24–25.

with particularity. *See Anschutz Corp.*, 690 F.3d at 108 (noting that Rule 9(b) applies to "the statements that the plaintiff contends were fraudulent"); Fed.R.Civ.P. 9(b) (requiring parties to "state with particularity the circumstances constituting fraud"). Insofar as Ali's fraudulent misrepresentation claim is based on these statements, the Court therefore denies the motion to dismiss.

### b. Fraudulent Concealment

Ali alleges that the defendants "knowingly and intentionally concealed" three facts from him: (1) "that they had not requested [his] federal loans," (2) "that there was no federal mandate requiring cancellation," and (3) "that AUA was placed on HCM2 by the Department of Education." Doc. 25 at 11 ¶ 23.

The defendants appear to argue that the first allegation—that they concealed their failure to request his loans—is not plausible for the same reason that Ali's misrepresentation claim based on his billing statements fails. Doc. 36-1 at 13 (grouping the two allegations together). In other words, the defendants treat both allegations as based on the same underlying premise: namely, that the defendants "misrepresented or concealed . . . that [Ali] had received Title IV funds." *Id.* And they argue that a concealment claim based on this premise fails for the same reason that Ali's misrepresentation claim does—because the billing statements merely reflect HCM2's requirement that the school must credit a student's account prior to requesting reimbursement. *Id.* In addressing these allegations together, however, the defendants fail to recognize a critical difference between the two: while Ali's misrepresentation claim based on the billing records is premised on the defendants' alleged "recei[pt]" of his loans, his concealment claim is based on their alleged failure to "request[]" the loans, which, in context, plausibly refers to a request for reimbursement. Doc. 25 at 11 ¶¶ 21, 23(a). And, in the context of reimbursement, the defendants' argument that HCM2 required them to credit Ali's account do not appear to be relevant. Thus, the defendants

have not met their burden to show that the concealment claim should be dismissed on this basis.

In challenging the second basis for Ali's concealment claim—that the defendants concealed "that there was no federal mandate requiring cancellation"—the defendants rely on the same arguments that they raised regarding his misrepresentation claim based on the same issue. *See* Doc. 36-1 at 14. Because the Court was not persuaded by those arguments for the reasons already explained, Ali's concealment claim may also proceed on this basis.

In response to Ali's claim that the defendants fraudulently concealed "that AUA was placed on HCM2 by the Department of Education," Doc. 25 at 11 ¶ 23(c), the defendants raise one additional argument, Doc. 36-1 at 14. They contend that this alleged concealment cannot support Ali's claim because he has not alleged that the defendants had to a duty to disclose AUA's HCM2 status, especially given that AUA's HCM2 status was publicly disclosed by the DOE. *Id.* at 14–15.

In New York, a party to a business transaction has a duty to disclose in three situations:

> first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.

*Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

In his opposition, Ali invokes the first and third theories. Doc. 37 at 17–18. But, even assuming that those theories could apply here, *but see Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (explaining that "such a duty usually arises . . . in the context of business negotiations where parties are entering a contract" (internal quotations omitted)), Ali has not plausibly alleged that either were satisfied here. As to

AUA's HCM2 status, Ali has not alleged any half-truth; indeed, the complaint does not allege that the defendants made any representations to Ali regarding its DOE payment method at all. And because Ali concedes that the "DOE publicly discloses schools on HCM2 status," he cannot plausibly assert that AUA's HCM2 status was "not readily available" to him. Doc. 37 at 18. Thus, Ali's fraudulent concealment claim cannot proceed based on this omission.

3. *Tortious Interference with Prospective Economic Advantage*

Under New York law, in order to prevail on a claim for tortious interference with prospective economic advantage, a plaintiff "must show that '(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.'" *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (quoting *Catskill Development, L.L.C. v. Park Place Entertainment Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)). New York courts have rejected claims containing "only a general allegation of interference with customers without any sufficiently particular allegation of interference with a specific contract or business relationship." *Id.* at 262 (citing *McGill v. Parker*, 179 A.D.2d 98, 105 (1992)). The wrongful conduct must also be directed "at the party with which the plaintiff has or seeks to have a relationship," rather than at the plaintiff. *Armored Group, LLC v. Homeland Security Strategies, Inc.*, No. 07 Civ. 9694 (LAP), 2009 WL 1110783, at *2 (S.D.N.Y. Apr. 21, 2009) (citing *Carvel Corp. Noonan*, 3 N.Y.3d 182, 192 (2004)).

The defendants argue that Ali's claim fails because he has not alleged a specific relationship with an identified third party with which the defendants interfered. Doc. 36-1 at 16. The Court agrees.[22] At bottom, Ali premises this claim on his "prospective business relations with numerous third-party medical residency programs." Doc. 37 at

---

[22] Because the Court agrees that the claim fails on these grounds, it need not address the defendants' separate contentions that Ali failed to allege a wrongful purpose or improper means.

21. But to state a claim for tortious interference, he "must specify some particular, existing relationship through which [he] would have done business but for the allegedly tortious behavior." *Commercial Data Servers, Inc. v. International Business Machines Corp.*, 166 F. Supp. 2d 891, 898 (S.D.N.Y. 2001) (internal quotations omitted). Thus, his generalized assertion that he would have entered "business relations with numerous third-party medical residency programs," Doc. 37 at 21, is "far too vague to support a claim for tortious interference," *Commercial Data Servers, Inc.*, 166 F. Supp. 2d at 898.

Moreover, even if Ali had alleged specific business relationships, his claim would fail for an additional reason: any allegedly tortious conduct was directed toward him, rather than any party with whom he sought to have a relationship. *Carvel*, 3 N.Y.3d at 192 ("[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship."). Thus, even if the Court overlooked Ali's failure to identify any specific third-party—which itself is "fatal" to his claim, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 115 (2d Cir. 2010)—his failure to allege any conduct directed toward a third party would nonetheless doom the claim.

### 4. *New York General Business Law § 349*

To state a claim under GBL § 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) [the] plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015). Under § 349, conduct is "consumer-oriented" when it involves acts or practices with a "broader impact on consumers at large." *Koch v. Greenberg*, 626 F. App'x 335, 340 (2d Cir. 2015) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995)). This requirement "may be satisfied by showing that the conduct at issue 'potentially affect[s] similarly situated consumers.'" *Wilson v. Northwestern Mutual Insurance Co.*, 625 F.3d 54, 64 (2d Cir. 2010) (quoting *Oswego*, 85 N.Y.2d at 27). Thus,

27

even though conduct need not be recurring to violate § 349, private disputes, such as contract disputes or single-time transactions, would not violate § 349. *Oswego*, 85 N.Y.2d at 25. However, when a plaintiff "makes only conclusory allegations of impact on consumers at large, a GBL § 349 claim must be dismissed." *Miller v. HSBC Bank U.S.A., N.A.*, No. 13 Civ. 7500, 2015 WL 585589, at *8 (S.D.N.Y. Feb. 11, 2015).

The defendants argue that Ali's GBL § 349 claim must be dismissed because he "alleges conduct unique to him" and "does not allege that [they] engaged in deceptive acts or practices in their marketing or provision of services to any other student." Doc. 36-1 at 18. That assertion, however, is plainly belied by the face of the complaint, which alleges that Ali is one of at least one hundred U.S. students who have been subject to the same specific course of conduct. *See* Doc. 25 at 12–13 ¶¶ 35–39. To be sure, Ali's allegations on this score are sparse; but, taking them as true, as the Court must, they plausibly suggest that the defendants' conduct constituted more than just a private dispute with Ali, and had a broader impact on students at AUA who relied on Title IV loans. *See Rosendale v. Mr. Cooper Group Inc.*, No. 19 Civ. 9263 (NSR), 2021 WL 4066821, at *19 (S.D.N.Y. Sept. 7, 2021) (holding that the plaintiff's allegation that "other consumers [faced the same conduct was] sufficient to plead consumer-oriented conduct at [the motion to dismiss] stage," even though "the record supporting [p]laintiff's contention . . . [was] indisputably thin"). At the very least, the complaint plausibly alleges that the conduct potentially affected similarly situated students insofar as the alleged conduct was "capable of repetition," *Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 774 (2d Dep't 1995), and the complaint alleges that the defendants had a motive to repeat their alleged deception: namely, avoiding further regulatory scrutiny. Indeed, absent any allegation that *Ali's* request for federal student aid was uniquely likely to trigger such scrutiny, one can reasonably infer that this motive would extend to other students' aid requests. Finally, the Court notes that the conduct alleged here does not involve a "complex" or "negotiated" transaction between sophisticated parties, but rather presents "the disparity

28

of bargaining power . . . that is the signature of the more run of the mill consumer fraud case." *Teller*, 630 N.Y.S.2d at 775; *see also New York University v. Continental Insurance Co.*, 87 N.Y.2d 308, 321 (1995) (holding that conduct did not "affect[] the consuming public at large" when it involved a "contract dispute" based on a "complex insurance [agreement] . . . in which each side was knowledgeable and received expert representation and advice" and the agreement "was tailored to meet the purchaser's wishes and requirements"). Thus, the Court concludes that Ali has sufficiently alleged consumer-oriented conduct at this stage of the proceedings.

     5. *New York Education Law § 640*

New York Education Law § 640 prohibits "degree-granting institution[s] or licensed private career school[s]" from:

> (a) withhold[ing] a transcript because a student owes a debt to such institution or school;
>
> (b) condition[ing] the provision of a transcript on a student's payment of a debt to such institution or school; or
>
> (c) charg[ing] a higher fee or provid[ing] less favorable treatment of a transcript request because a student owes a debt to such institution or school, provided however, that an institution or school may charge a fee for the issuance of a transcript.

N.Y. Educ. Law § 640. In addition to permitting enforcement by the superintendent of financial services, the statute allows "any person who has been injured by reason of any violation of this section [to] bring an action in their own name to enjoin such unlawful act or practice." *Id.* § 630(3).

Ali asserts this claim based on the defendants' "refus[al] to release [his] official transcript." Doc. 25 at 13 ¶ 43. But, given that this provision solely permits injunctive relief, Ali's admission that he has received his transcript renders this claim moot. Doc. 37 at 22 (noting that Ali received his diploma and transcript on April 11, 2025). Therefore, this claim is also dismissed.

*6. Conversion*

The defendants finally argue that Ali's conversion claim should be dismissed because it "rests on the same factual allegations as his breach of contract claim." Doc. 36-1 at 19. In New York, a "cause of action for conversion cannot be predicated on a mere breach of contract." *Jeffers v. American University of Antigua*, 3 N.Y.S.3d 335, 339 (1st Dep't 2015). Thus, where the facts supporting a conversion claim are substantively identical to those supporting a breach of contract claim, the conversion claim must be dismissed. *Elkon v. American Reliable Insurance Co.*, No. 08 Civ. 3717 (TCP), 2010 WL 11629550, at *7 (E.D.N.Y. Feb. 23, 2010). Here, Ali does not dispute that the same material allegations undergird both claims. *Compare* Doc. 25 ¶¶ 2–9 (breach of contract), *with id.* ¶¶ 45–49 (conversion). Thus, Ali's conversion claim is dismissed.

### C. Nature of the Dismissal

In their motion, the defendants assert, without further explanation, that any dismissal should be issued with prejudice, or alternatively, without leave to amend. Doc. 36-1 at 19. The request is denied. Dismissals for lack of subject matter jurisdiction are without prejudice. *See Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 121 (2d Cir. 2017). As to the claims dismissed pursuant to Rule 12(b)(6), dismissal with prejudice is not appropriate because this is the first adjudication of Ali's claims on the merits.

## V.    CONCLUSION

For the reasons set forth above, the motion to dismiss is GRANTED in part and DENIED in part. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 36.

The parties are directed to appear for a telephonic status conference on April 30, 2026, at 11:30 a.m. The parties are instructed to call (855) 244-8681; enter access code 2301 087 7354#; and enter # again when asked to enter the attendee ID number. The

parties are further instructed to join the call five (5) minutes prior to the conference's start time.

It is SO ORDERED.

Dated:    March 30, 2026
          New York, New York

_____
EDGARDO RAMOS, U.S.D.J.